IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Falls Township,                            :
                                           :
              Petitioner                   :
                                           :
       v.                                  : No. 1458 C.D. 2021
                                           : Submitted: December 9, 2022
Unemployment Compensation                  :
Board of Review,                           :
                                           :
              Respondent                   :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                            FILED:  July 5, 2023

       Falls Township (Employer) petitions for review of the Order of the
Unemployment Compensation Board of Review (Board), which adopted and
incorporated a Referee's findings of fact, as amended, and conclusions of law in a
Decision granting unemployment compensation (UC) benefits to Stephanie A.
Metterle (Claimant), on the basis that she is not ineligible for UC benefits pursuant
to Section 402(e) of the Unemployment Compensation Law (Law).[1]  We affirm.

       Claimant was employed as a police officer by Employer from October
2009, to October 21, 2020.  Employer's work policy requires honesty, and Claimant
was aware of the policy.  On March 28, 2019, Claimant filed a complaint with the

_____

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S.
§802(e).  Section 402(e) of the Law, provides in relevant part: "[A]n employe shall be ineligible
for compensation for any week . . . [i]n which [her] unemployment is due to [her] discharge or
temporary suspension from work for willful misconduct connected with [her] work . . . ."  43 P.S.
§802(e).

Equal Employment Opportunity Commission (EEOC)/Pennsylvania Human Relations Commission (PHRC) alleging, *inter alia*, Sex Discrimination, Pregnancy Discrimination, and Retaliation by Employer's Police Department (Department) in violation of Section 5(a) and (d) of the Pennsylvania Human Relations Act.[2] *See* Certified Record (CR) at 187-88.

> In the complaint, Claimant stated, in relevant part:
>
> 12. By way of further example, in February 2018, I was removed from the Major Incident Response Team ("MIRT") and replaced by a male officer on the team. When I asked why I was no longer a part of the team, [then] Lieutenant Whitney told me I had never been a part [of] MIRT, despite me attending MIRT training and previously working on MIRT details.

CR at 185. The complaint also included an unsworn verification executed by Claimant, which provided that statements contained in the complaint are true and correct to the best of her knowledge, information, and belief. *See id.* at 189. Claimant was discharged on October 21, 2020, for violating Employer's policy by purportedly falsifying her EEOC/PHRC complaint and Conduct Unbecoming an Officer. *See id.* at 13, 16.

On October 25, 2020, Claimant submitted a claim for UC benefits. On March 29, 2021, the UC Service Center mailed a Notice of Determination that Claimant was not entitled to benefits under Section 402(e) of the Law. *See* CR at 30-35. Claimant appealed the Service Center's Determination to a Referee.

On August 2, 2021, a hearing was conducted before the Referee. Claimant testified at the hearing in support of her claim for benefits. *See* CR at 132-33, 152-63. Employer presented the testimony of Sergeant Christopher Clark and

---

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §955(a) and (d).

Chief Nelson Whitney in opposition to the claim for benefits. *See id.* at 129, 133-52, 163-66. Claimant and Employer also introduced a number of documents into the record in support of their respective positions. *See id.* at 96-122, 170-95.

With respect to her participation as a MIRT member and her statements in the EEOC/PHRC complaint, Claimant testified, in pertinent part, as follows:

> [Q]   Okay, and at some point in 2011, did you become aware of an opportunity to participate in the MIRT []?
> [A]   I did.
>
> [Q]   And how did you learn about it?
> [A]   Lieutenant Ward sent an e-mail asking for volunteers for the Bucks County [MIRT].
>
> [Q]   Okay, and did you respond to that e-mail?
> [A]   I did.
>
> [Q]   Okay, and did you indicate -- what did you indicate regarding your interest in MIRT?
> [A]   I indicated that I was interested in becoming a member of the MIRT [].
>
> * * * *
>
> [Q]   Okay.  Were you sent for any training?  Actually, let me -- go ahead, were you sent for any training after . . .
> [A]   I was.
>
> [Q]   . . . you submitted your request.  Okay.
> [A]   Yes.
>
> [Q]   Tell us a little bit about the training.
> [A]   It was two different trainings.  There was a two-day training that I attended in Philadelphia with six or seven other officers.  And it was all, you know -- obviously, we were talking to each other, and it was all these same officers who responded to that e-mail from Lieutenant Ward, and that they all wanted to be members of the MIRT [].  And we drove down together and we went to the

3

training and it was about riot control and some, you know, tactics that you would use to control large crowds of people in Philadelphia.

* * * *

[Q]  Okay.  Did you respond to any large-scale incidents as part of the MIRT []?
[A]  I did.

[Q]   And what was that?
[A]  When President Barack Obama came to Falls Township in April 2011.  I did attend that along with other MIRT members.

* * * *

[Q]  Okay.  At any point after you had expressed your interest to join MIRT, were you issued any special equipment?
[A]  I was.

[Q]  What . . .
[A]  I was issued a baton . . .

[Q]  . . . were you issued?
[A]  . . . sorry.  A baton and a helmet.

[Q]  Okay, and were any other officers issued those same items?
[A]  Yeah, there were a few other officers that were issued these items.  In fact, [] when I was issued the items, some of the guys made a joke because the front of the helmet said S/M for small[/]medium, but they're also my initials.  So guys made like jokes about like, oh, did you get yourself engraved, like, maybe I'll take it at the same place that you took yours, you know -- just, you know, making a joke of it.  So I just kind of remember that.  It sticks out [in] my head as something because of the fact that it's [my initials] or small[/]medium.

* * * *

4

[Q] Now, tell us about -- let's go to 2018, Eagles won the Super Bowl and there was a parade. At some point, did you learn that the [T]ownship had sent some MIRT members to work the Eagles parade?
[A] Yeah. After the fact, I learned that Falls Township went down there.

[Q] And did you have any concerns when you found out which officers went to respond?
[A] Yeah. Once I found out that [an officer] who was a less senior officer than me went, I was concerned as to why I wasn't contacted prior to the parade to see if I was interested in working that parade.

[Q] And why should you -- why should the [D]epartment have contacted you to see if you were interested in working the parade?
[A] Because I believe that I was a member of the MIRT []. And I would have been eligible for that overtime.

[Q] Okay. And you submitted an overtime slip; is that correct?
[A] I did.

[Q] Okay. Now, Chief Whitney testified that he conducted some investigation after you submitted your overtime slip. Do you recall talking with Chief Whitney at some point after you had submitted your MIRT overtime request?
[A] Yes. I actually spoke with him prior to submitting the request just to clarify that the information that I was receiving from other officers that these three guys went down to the parade and they were obviously talking about it because, you know, everyone [is] an Eagles fan and everything they got to see, you know, whoever NFL or whatever. I wanted to make sure that I had my information correct before I submitted anything. So I spoke with him prior to submitting it and then, you know, multiple times afterwards.

* * * *

5

[Q]    Okay, and you were paid for that missed overtime -- that missed MIRT overtime assignment; correct?
[A]    Correct.

[Q]    Okay, and the -- after -- I say a month or so after, did you receive a memo from then Lieutenant Whitney regarding the members of the MIRT?
[A]    Yes.

[Q]    Okay, and was your name included as a MIRT member?
[A]    No, it was not.

[Q]    Okay, and did you send [then] Lieutenant Whitney an e-mail after you received that memo?
[A]    I did . . .

[Q]    And a . . .
[A]    . . . asked him if . . .

[Q]    Go ahead.
[A]    I asked him if it was the official notice of their removal from the MIRT [], you know, like I said, we had spoken numerous times in between this.  So there was never any formal verification or non-verifications of my membership.

[Q]    Okay, and so . . .
[A]    And . . .

[Q]    . . . in the entire period of time.  Go ahead, Officer.
[A]    In the meantime, while we're talking, there's no formal verification or non-verification, they also, in the meantime, paid me for the MIRT overtime.

[Q]    Sure.  And so in this period of time, February, March 2018, do you believe that you were on the MIRT []?
[A]    Yes.

[Q]    Okay, and after [then] Lieutenant Whitney told you hey, you're not on the MIRT [], did you accept that as his decision?

6

[A]    Yeah.  I accepted his, you know, that he was saying I'm no longer on the -- on, you know, that I'm not on the MIRT [].  That's what his e-mail said, so.

* * * *

[Q]    Okay.  When you made this allegation [in paragraph 12 of the EEOC/PHRC complaint], as you were removed from the [MIRT], in March of 2019 when you're making this allegation, did you believe that you had been removed from the MIRT [] back in 2018?
[A]    Yes.

[Q]    Okay, and so is that statement true and correct to the best of your knowledge, information, and belief?
[A]    Yes.

* * * *

[Q]    Okay.  And so when you made that allegation, did you believe that you had been replaced on the MIRT [] by [another male officer]?
[A]    Yes.

[Q]    And so, would that statement [be] true and correct to the best of your knowledge, information, and belief?
[A]    Yes, it was.

[Q]    Okay.  You go on in allegation 12 to note this interaction you had with [then] Lieutenant Whitney.  When I asked why I was no longer part of the team, [then] Lieutenant Whitney told me I had never been a part of MIRT.  Okay.  And so in March of 2019, when you were making this allegation, that's correct, right?  You would -- you had asked why you were no other part of the team and he told you were never part of MIRT; correct?
[A]    Yes.

[Q]    Okay, and then you say, you know, despite me attending MIRT training, and previously working on MIRT details, first, what training are you talking about?

7

[A] The training that myself and the other officers that all responded to the e-mail were sent to in 2012 in Philadelphia.

[Q] And what MIRT details?
[A] The Obama detail.

[Q] Okay. And so, if we move forward, at the end of your complaint, you signed a verification form. . . . And then your verification, this applies to the whole thing, but it includes paragraph 12. You verified that the statements contained in the complaint are true and correct to the best of your knowledge, information, and belief and that applied to paragraph 12; right?
[A] Yes.

[Q] Okay. Were you lying in paragraph 12?
[A] No.

CR at 152-53, 154-55, 156-58.

With respect to Claimant's participation in MIRT and payment for overtime for a MIRT detail, Chief Whitney testified, in relevant part, as follows:

[Q] [] Chief, . . . you testified that in 2018, you were assigned to investigate an overtime submission that had been submitted by [Claimant]; correct?
[A] Yes.

[Q] Okay. Would that have been February of 2018?
[A] Yes. That's the overtime related to the Eagles Super Bowl parade.

[Q] And the Eagles Super Bowl parade had [the] Township deployed some of its MIRT members to respond to the Eagles parade; correct?
[A] Yes.

[Q] Okay, and [Claimant] submitted an overtime request for payment for that because in her view, she was bypassed and the [D]epartment sent a less senior MIRT member to respond to the Eagles parade; correct?
[A] Yes.

8

[Q] Okay, and so [Claimant] said she was on the MIRT []. She should have worked that detail. And you were assigned to investigate that claim; correct?
[A] Yes.

[Q] All right. You testified regarding your investigation, [Claimant] was paid overtime for that Eagles parade; correct?
[A] Yes, she was paid in error. That's correct.

[Q] Okay. She was paid though, right? She submitted a request for MIRT overtime. You investigated it, and then she was paid; right?
[A] Yes. She was paid in error because a lieutenant that reviewed the [s]lip sent it through.

[Q] Did you res[cind] -- did the Township go back and rescind their payment?
[A] Well, I recommended to the chief that he make her pay it back, but he didn't take my recommendation.

[Q] Okay. So the chief of police didn't rescind any MIRT payment made to [Claimant] for the Eagles parade; correct?
[A] That is correct.

[Q] Okay, and then in the wake of [Claimant's] Eagles parade overtime submission, you sought clarity from the [C]ounty on who was -- who the active members of the MIRT [] were; is that correct?
[A] Yes.

* * * *

[Q] Okay. Now, the reason you did this, right, the reason you clarified MIRT's status was because at that time, the Township did not have a standing roster of MIRT [] members; correct?
[A] If anybody had a roster, I didn't have it.
[Q] And you were assigned to -- earlier, you were assigned to investigate a MIRT claim, right. And so you talked to all the MIRT [] members. So, I would assume

9

that as part of your thorough investigation, if there was a roster of MIRT [] members, you would have found it there?

[A] Well, I mean, I would hope to. There's some people that retired that may have been involved in MIRT. Up to that point in 2018, I had never had any involvement whatsoever in MIRT. So it was all new to me, but if your question to put a sharp point in it is did I find a roster, no, I did not. That's why one of the reasons I put that e-mail out to clarify going forward, who was and who wasn't on MIRT.

* * * *

[Q] Okay. And if we look at . . . the very bottom e-mail is your e-mail to all sworn personnel, and then we have Officer Killeen's response to you saying, with the exception of this current list, I was not notified that I was no longer on MIRT. You responded to him, I received the information from Lieutenant Pennington. From what I can tell, that is not unusual because MIRT has operated very informally. That's one of the reasons I put out the memo; correct?

[A] Yes. In talking with Lieutenant Pennington, I discovered that there were several officers who were all MIRT at the time and then were on MIRT. And in talking with them, it did seem informal that through time, they just -- they were less active. Some of them got promoted from positions. Some of them lost interest, but there didn't seem to be, you know, an ironclad paper trail of, hey, this [Township] officer who was on MIRT, who went through the, you know, at this point forward was no longer on MIRT. That's what my reference there is. . . .

* * * *

[Q] [] So, [C]hief, just to clarify, one part of the Eagles [p]arade issue. Had [Claimant] been on the MIRT [] based on your review, she would have been paid for that missed overtime assignment; correct?

[A] Yes. If it's -- if factually she had been on MIRT, yes.

10

[Q]   Even though she hadn't worked it, right, it was a seniority grievance, a less senior person went -- and if she was on MIRT and a less senior person went, the consequence for that is that she would get payment for that missed overtime assignment; right?
[A]   Yes.

CR at 145-47, 151; *see also id.* at 113, 195.

On August 5, 2021, the Referee issued a Decision in which she made the following relevant finding of fact:

> [C]laimant had reason to believe that she was part of MIRT, including attending what she thought was MIRT training, participating in events where MIRT was present, receiving gear not all officers received, and receiving compensation for a MIRT event that she complained she should have been a part of as a MIRT member, but was excluded from.

CR at 198.

Based on the facts as found, the Referee stated the following conclusions:

> [E]mployer's various policies prohibit falsification or dishonesty, and [C]laimant was aware of the policies. [E]mployer discharged [C]laimant for allegedly falsifying a specific portion of her unsworn complaint to the EEOC/PHRC wherein she stated that she was a part of [E]mployer's MIRT. [E]mployer alleges that she was never a part of MIRT, and therefore could not have been removed from it.
>
> [C]laimant believed that she was a MIRT member in part because she had been sent for what she believed was MIRT training, received MIRT equipment not provided to the regular police officers, and had attended at least one event with MIRT. Most importantly, [C]laimant had alleged that she was entitled to pay as a MIRT member for an event that [E]mployer had failed to offer her the opportunity to work, when [E]mployer should have. [E]mployer did not dispute her right to work the event or

11

MIRT status, and in fact paid her for the event like she had participated as a MIRT member. [C]laimant had reason to believe that she was a MIRT member, and therefore did not falsify her EEOC/PHRC complaint. Certainly, if there was a falsification, it was not deliberate.

Furthermore, the EEOC/PHRC complaint requires only that she provide an unsworn verification that the information she alleges therein was true and correct to the best of her knowledge, information, and belief. She did not violate the unsworn verification required to submit the EEOC/PHRC complaint, and therefore did not falsify documentation, or otherwise act dishonestly, to justify a denial of benefits under Section 402(e) of the Law.

CR at 198-99.

Accordingly, the Referee issued an order reversing the UC Service Center's Determination and granting benefits on the basis that Claimant is not ineligible for UC benefits under Section 402(e) of the Law. *See* CR at 201. On August 20, 2021, Employer appealed the Referee's Decision to the Board. *See id.* at 209-30.

On December 1, 2021, the Board issued an Order affirming the Referee's Decision that states, in relevant part:

The [Board], after considering the entire record in this matter, concludes that the [D]etermination made by the Referee is proper under the [Law]. Therefore, the Board adopts and incorporates the Referee's conclusions. The Board numbers the Findings of Fact 1-6 as is customary. The Board amends Finding of Fact 3, changing "09" to "19." The Board adopts and incorporates the remainder of the Referee's findings.

[E]mployer admitted at the hearing there was no "ironclad paper trail" and "it did seem informal . . . ." [E]mployer also admitted in an e[-]mail "MIRT has operated very informally . . . ." The Board makes no conclusion on

12

whether [C]laimant actually ever was on the MIRT [], only that she had believed so.

CR at 253. Employer then filed the instant timely petition for review of the Board's Order.

On appeal,[3] Employer claims: (1) the Board "erred as a matter of law and ignored the substantial weight of the evidence in determining that Claimant believed that she was a part of the Bucks County [MIRT]" based on the evidence that it presented demonstrating that she was not, in fact, a member of MIRT; and (2) the Board erred as a matter of law in concluding that Claimant did not engage in willful misconduct by falsely claiming that she was a member of MIRT in her EEOC/PHRC complaint based on the foregoing Township evidence.

Although the Law does not define the term "willful misconduct," this Court has observed:

> Our Supreme Court defines willful misconduct as behavior that evidences a willful disregard of the employer's interests, a deliberate violation of the employer's work rules, or a disregard of standards of behavior that the employer can rightfully expect from its employees. When asserting discharge due to a violation of a work rule, an employer must establish existence of the rule and its violation. The employer bears the initial burden of proving a claimant engaged in willful misconduct.[4] Whether a claimant's actions rise to the

---

[3] Our scope of review is limited to determining whether constitutional rights were violated, an error of law was committed, or the necessary factual findings are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Criswell v. Unemployment Compensation Board of Review*, 393 A.2d 1071, 1072 (Pa. Cmwlth. 1978).

[4] As the burdened party, Employer had to meet both its burden of production and its burden of persuasion to establish willful misconduct in this case. *Kirkwood v. Unemployment Compensation Board of Review*, 525 A.2d 841, 844 (Pa. Cmwlth. 1987).

level of willful misconduct is a question of law fully reviewable on appeal.

Further, the Board is the ultimate fact[]finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence. It is irrelevant whether the record contains evidence to support findings other than those made by the fact[]finder; the critical inquiry is whether there is evidence to support the findings actually made. Where substantial evidence supports the Board's findings, they are conclusive on appeal. [T]he prevailing party below [] is entitled to the benefit of all reasonable inferences drawn from the evidence.

*Ductmate Industries, Inc. v. Unemployment Compensation Board of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (citations omitted). Consequently, the Board was free to reject Employer's evidence of Claimant's purported willful misconduct, even if it was unrebutted. *Carriers Terminal Company v. Unemployment Compensation Board of Review*, 449 A.2d 873, 874 (Pa. Cmwlth. 1982).

As outlined exhaustively above, there is substantial evidence supporting the Board's determination that Claimant subjectively believed that she was a member of MIRT, whether or not she ever actually was a member. As a result, the Board did not err as a matter of law in determining that Claimant did not commit willful misconduct by deliberately falsifying the EEOC/PHRC complaint. Therefore, it is of no moment that Employer presented evidence which, if credited and accepted, rebutted Claimant's testimony and objectively demonstrated that Claimant was not a part of MIRT.

Accordingly, the Board's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Falls Township,                        :
                                       :
                        Petitioner     :
                                       :
              v.                       : No. 1458 C.D. 2021
                                       :
Unemployment Compensation              :
Board of Review,                       :
                                       :
                        Respondent :

# **O R D E R**

AND NOW, this 5<u>th</u> day of <u>July</u>, 2023, the Order of the Unemployment

Compensation Board of Review dated December 1, 2021, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge